432 A.2d 600

**In re Shane DAVIS, a juvenile.**

**Appeal of Annie S. MILLER and Harvey A. Miller.**

Superior Court of Pennsylvania.

Argued Sept. 9, 1980.

Filed June 19, 1981.

Petition for Allowance of Appeal Granted Oct. 16, 1981.

William G. Sherr, Allentown, for appellants.

Robert J. Manara, Reading, for Shane Davis, appellee.

Alan Readinger, Reading, for Berks County, participating party.

Before WICKERSHAM, HOFFMAN and VAN der VOORT, JJ.

WICKERSHAM, Judge:

This is an appeal from an order granting custody of a child to Berks County Children and Youth Services (hereinafter referred to as Children's Services) for placement in a foster home. The appeal is based on four allegations of error. For the reasons set forth below, we affirm the order of the lower court.

The history of this case is both tragic and lengthy. In the mid-1950's, appellants, Annie S. Miller and Harvey A. Miller, had a farm and peach orchard in Berks County, Pennsylvania. They hired black migrant laborers to help them work the land. Betty Davis Pellot was the daughter of one such laborer. When Betty was abandoned on the farm at the age of two, the Millers took the child in and raised her.[1]

When Betty was in high school, she apparently began using drugs and evidence was presented that her relationship with the Millers began to deteriorate. At the age of nineteen, Betty left the Millers' household to live on her own. On March 21, 1973, Betty gave birth to Shane Davis, the subject of this appeal. The child was born out-of-wedlock, son of an unknown Caucasian father. Shane was left with the Millers three days after his birth while his mother searched for an apartment. During the following months, Betty moved frequently and the Millers would care for Shane each time he became ill or when his mother was unable to care for him. Eventually, Shane moved in with the Millers on a permanent basis.

On November 24, 1974, Betty Davis Pellot gave birth to twins, Shonda Lynn Davis and Sean Davis. The twins were also born out-of-wedlock, the children of a Caucasian father whose identity was known. Betty moved into a trailer on the Millers' farm after their birth. While the twins lived in the trailer with their mother, Shane continued to live in the house with the Millers.

After a year and a half of living on the farm, Betty married Pedro Pellot. Betty and the twins then moved to Reading, Berks County to live with her new husband. Shane stayed with the Millers.

After an altercation with Annie Miller on November 8, 1977, Betty took Shane to live with the rest of the family in Reading. The Millers then filed a petition for a writ of habeas corpus. The court awarded custody of Shane to

1. There is no indication in the record that the relationship between Betty Davis and the Millers was ever formalized by custody or adoption proceedings.

Betty and liberal visitation privileges to the Millers. These visitation privileges soon became a source of conflict and Betty refused to allow the Millers to visit Shane. The Millers responded by petitioning the court to have Betty held in contempt. The court entered a new order on May 23, 1978 which awarded permanent custody of Shane to the mother but gave the Millers temporary custody for two weeks each summer.

Soon thereafter, Shane spent two weeks with the Millers. On August 14, 1978, less than a month after Shane's return to his mother's household, Betty was murdered by her husband in the presence of her three children.

An emergency court order seeking custody of the three children was filed that same day, August 14, by Children's Services and the children were temporarily placed in the foster home of Iris and Larry Young. The next day, the Millers were awarded temporary custody of Shane pending permanent disposition of the three children. The twins remained with the Youngs.

In orders of the court dated November 13, 1979 and November 20, 1979, Shane, Shonda Lynn and Sean Davis were found to be dependent children within the definition of the Juvenile Act, 42 Pa.C.S. § 6301 *et seq.*[2] Custody of the three children was then awarded to Children's Services. On November 30, 1979, the Millers appealed the court's order as to the custody award of Shane. A petition for a stay of the court's order was denied by the court on January 23, 1980. This court also denied a stay of the order on May 6, 1980. The Millers then filed a motion for reconsideration. The court below denied the motion on May 19, 1980 and this court affirmed the decision on July 14, 1980.

We first note that an appellate court's scope of review is very broad in child custody cases. *Commonwealth ex rel. Holschuh v. Holland-Moritz,* 448 Pa. 437, 292 A.2d 380

---

**2.** The Juvenile Act supersedes the Act of Dec. 6, 1972, P.L. 1464, No. 333, § 40, 11 P.S. §§ 50–101 *et seq.* repealed by Section 2(a) of the Judiciary Act Repealer Act, Act of April 28, 1978, P.L. 202, 42 P.S. § 20002(a) [1474].

(1972); *Jones v. Kniess,* 249 Pa.Super. 134, 375 A.2d 795 (1977). While this court cannot nullify or usurp the fact-finding function of the lower court, we are not bound by the deductions or inferences made by the lower court. *Tomlinson v. Tomlinson,* 248 Pa.Super. 196, 374 A.2d 1386 (1977); *Commonwealth ex rel. Gifford v. Miller,* 213 Pa.Super. 269, 248 A.2d 63 (1968). After a careful review of the evidence, we are required to make an independent judgment based on the evidence and testimony. *Sipe v. Shaffer,* 263 Pa.Super. 27, 396 A.2d 1359 (1979); *Scarlett v. Scarlett,* 257 Pa.Super. 468, 390 A.2d 1331 (1978).

■ Appellants' first allegation of error states that the hearing court improperly adjudicated Shane to be a dependent child under the Juvenile Act. This threshold issue is of the upmost importance for unless there was a finding of dependency, the hearing court did not have the authority to order a disposition of Shane under the Juvenile Act. *See In re Jackson,* 267 Pa.Super. 428, 406 A.2d 1116 (1979); *In re LaRue,* 244 Pa.Super. 218, 366 A.2d 1271 (1976); *In re Clouse,* 244 Pa.Super. 396, 368 A.2d 780 (1976); 42 Pa.C.S. § 6351.

■ Before addressing the merits of the above contention, we must examine the claim of Children's Services that appellants have not preserved the issue of the validity of Shane's adjudication of dependency for appeal. Their allegation is based on appellants' failure to include the issue in the Statement of Questions as required by Pa.R.A.P. 2116(a) and to thoroughly argue the issue in its brief.

We find Children's Services' contention to be without merit for the concept of waiver is not consonant with a court's goal of determining a child's best interests. To hold that a party's error may limit this court's review of potentially enlightening evidence is to limit our ability to make a thorough analysis of the record and testimony. We addressed this issue of waiver in *Gunter v. Gunter,* 240 Pa.Super. 382, 361 A.2d 307 (1976), and stated the following:

Counsel for the father has argued in his brief that the error of the hearing judge in not ordering a transcript has been waived because counsel for the mother did not complain of it at the time, "[when it] could have been eradicated." (Brief for Appellee, at 11.) This argument mistakes the nature of a custody hearing. The sole purpose of the hearing is to determine what is in the best interests of the child. *Commonwealth ex rel. Parikh v. Parikh,* 449 Pa. 105, 107–08, 296 A.2d 625, 627 (1972) ("the best interest of the child is paramount"); *Commonwealth ex rel. Holschuh v. Holland-Moritz, supra,* 448 Pa. at 444, 292 A.2d at 383 ("all other considerations are subordinate"). It is David's future we are determining; he had a right to expect that the hearing judge would follow prescribed procedures. That right was not one that the hearing judge could ignore, or that either parent could waive. *Cf. Stapleton v. Dauphin County Child Care Service,* 228 Pa.Super. 371, 324 A.2d 562 (1974) (allocatur refused). *Id.,* 240 Pa.Super. at 389–390, 361 A.2d at 311.

We are particularly reluctant to waive this issue, for without a finding of dependency, this court has already recognized that the Millers' need for appeal would have been obviated. Moreover, the transcript contains ample testimony concerning appellants' argument that Shane is not a dependent child within the meaning of the Act. Likewise, appellants' brief also contains a reference to the issue, albeit, short.

The hearing court found Shane to be a dependent child[3] under 42 Pa.C.S. § 6302 which provides, *inter alia:*

"*Dependent child.*" A child who:

.    .    .    .    .

(4) is without a parent, guardian, or legal custodian.

.    .    .    .

**3.** The term "dependent child" was changed from "deprived child" as part of a 1977 amendment. Juvenile Act, Act of December 6, 1972, P.L. 1464, *as amended* by the Act of August 3, 1977, P.L. 155. The term dependent child has been retained by 42 Pa.C.S. § 6301 *et seq.* Prior case law, of course, uses the term "deprived child."

Since his mother was murdered and the identity of his father was unknown, the lower court found Shane to be without a parent. Appellants argue for an expended definition of the term "parent," one not limited to a blood relationship but one including a "parental type supervision and control and care." (N.T. at 23a). We find, however, that the conventional sense of the word "parent," one implying consanguinity, is the definition contemplated for use in the Juvenile Act. *See* Black's Law Dictionary 1003, 1004 (5th ed. 1979) (Parent. The lawful father or mother of a person. One who procreates, begets, or brings forth offspring.) While we agree with the Millers that they have performed the traditional duties assumed by parents, it does not change the fact that they are not the "natural" parents of Shane. As the Pennsylvania Supreme Court stated in *Ellerbe v. Hooks*, 490 Pa. 363, 369, 416 A.2d 512, 514–515 (1980), "[T]he blood relationship of parenthood has traditionally served and continues to serve as our society's fundamental criterion for allocating control over and responsibility for our children . . . ."

Shane was also adjudicated to be a dependent child because he was found to be without a legal custodian.[4] The Juvenile Act defines a custodian as "[a] person other than a parent or legal guardian, who stands in loco parentis to the child, or a person to whom legal custody of the child has been given by order of a court." 42 Pa.C.S. § 6302. The Millers contend that they stand *in loco parentis* to Shane.

Pennsylvania courts recognize that a person may "put himself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. This status, [known as 'in loco parentis'] embodies two ideas; first, the assumption of a parental status, and second, the discharge of parental duties." *Commonwealth ex rel.*

4. The Millers do not contend that they are guardians under the definition of 1 Pa.C.S. § 1991: "Guardian." A fiduciary who legally has the care and management, or the estate, or both, of another under a legal disability."

*Morgan v. Smith,* 429 Pa. 561, 565, 241 A.2d 531, 533 (1968).

*Spells v. Spells,* 250 Pa.Super. 168, 172, 378 A.2d 879, 881–882 (1977).

■ We find, however, that we need not determine whether or not the Millers stand *in loco parentis* to Shane. In its definition of a dependent child, the Juvenile Act states that the child must be without a *legal* custodian. *See* 42 Pa.C.S. § 6302 (emphasis added). As the hearing court stated, the terms "legal" and "custodian" must be read together and given equal emphasis. We find that the term "legal custodian" in the context of the Juvenile Act means one who is awarded custody pursuant to a court order.

The above interpretation is supported by Section 6357 of the Juvenile Act entitled "Rights and duties of *legal custodian*" wherein the statute refers to "[a] custodian to whom *legal* custody has been *given by the court* under this chapter . . . ." (emphasis added). Moreover, "[i]f the legislature intended 'custodian' here to mean merely the in loco parentis relationship, there would have been no need to modify it with a word 'legal.' The definition of custodian found elsewhere in 42 Pa.C.S. § 6302 would have been sufficient." Lower ct. op. at 6. *See, e. g.,* 42 Pa.C.S. 6302(3).

■ After adjudicating Shane to be a dependent child, the hearing judge was required to enter an order of disposition under the Juvenile Act. Section 6351 provides, *inter alia,* the following:

**§ 6351. Disposition of dependent child**

(a) General rule.—If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the protection and physical, mental, and moral welfare of the child:

(1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.

(2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following:

(i) Any individual resident within or without this Commonwealth who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child.

(ii) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.

(iii) A public agency authorized by law to receive and provide care for the child.

The primary concern in child custody cases is the best interests of the child, including his physical, intellectual, moral and spiritual well-being. *Commonwealth ex rel. Cutler v. Cutler*, 246 Pa.Super. 82, 369 A.2d 821 (1977). Before determining Shane's best interests, the hearing court heard testimony that the home environments of appellants and the Youngs, the proposed foster parents, appeared to be of near equal quality. The opinion of the lower court recounted the testimony stating that the Millers' home was well-kept and that Shane received the proper care and guidance for his physical, mental and emotional well-being. The hearing judge also noted that the Youngs, both ministers, lived in a large home and that they had had three other foster children in their care for a total of eleven years. Most importantly, Mrs. Young testified that Shane would be reunited with his twin brother and sister who had been in their care since their mother's death.

In the final analysis of determining Shane's best interests, the lower court stated that "[e]ither home would be beneficial to Shane, yet, in our view, the child's interests are best served by placing him with the Youngs." Lower ct. op. at 8.

The hearing court first reasoned that Annie and Harvey Millers' advancing ages, 75 years and 83 years respectively, was a detrimental factor. While the court

realized that age alone should not deprive them of custody, it did consider age to be an important factor. *See Commonwealth ex rel. Kuntz v. Stackhouse,* 176 Pa.Super. 361, 108 A.2d 73 (1954). The hearing court stated that while the Millers were in good health at the time of the hearing, it was quite possible, considering their ages, that they would become ill or physically or mentally incapacitated. The court then noted that such events would subject Shane to further emotional trauma. As the Pennsylvania Supreme Court stated "[t]he age of seventy and beyond is hardly an ideal time of life to be raising two boys on the verge of entering their teenage years." *Commonwealth ex rel. Holschuh v. Holland-Mortiz,* 448 Pa. 437, 444, 292 A.2d 380, 383 (1972).

The hearing court's second reason for awarding custody to the Youngs was to have Shane grow up in the same household as his brother and sister. There has always been a strong policy in our law that, absent compelling reasons to the contrary, siblings should be raised in the same household. *Tomlinson v. Tomlinson, supra; Commonwealth ex rel. Martino v. Blough,* 201 Pa.Super. 346, 191 A.2d 918 (1963). This principle is in no way diluted by the fact that the reunited children in this case are half-brothers and sisters. *Albright v. Commonwealth ex rel. Fetters,* 491 Pa. 320, 421 A.2d 157 (1980); *Commonwealth ex rel. Grimes v. Grimes,* 281 Pa.Super. 484, 422 A.2d 572 (1980). Moreover, since Sean and Shonda Lynn are the only family Shane has in terms of consanguinity, the custody award is consonant with the fundamental purpose of the Juvenile Act to "preserve the unity of the family whenever possible . . . ." 42 Pa.C.S. § 6301(b)(1).

The Millers allege that Shane's best interests were not fully examined because the lower court did not interview the child and did not order psychiatric evaluations of the involved individuals. They argue that without the interview and evaluations, the record and opinion of the lower court are incomplete. *See Commonwealth ex rel. L.H.W. v. P.T.W.,* 262 Pa.Super. 281, 422 A.2d 159 (1980) (the

hearing court must provide us with a complete record and a comprehensive opinion supported by a thorough analysis of that record). Appellants request a remand ordering the lower court to comply with their demands or, in the alternative, a reversal of the lower court's order.

Although we agree with the Millers that an interview with the child subject to the custody dispute may often be helpful in determining his best interests, such an interview was not necessary in the instant case.

"While the preference of the child is one factor to be considered in awarding custody, the weight to be accorded this preference will vary according to the age, intelligence and maturity of the child." *In re Myers*, 242 Pa.Super. 225, 230, 363 A.2d 1242, 1244 (1976) (citing *Commonwealth ex rel. Bankert v. Children's Services*, 224 Pa.Super. 556, 307 A.2d 411 (1973)). Although the preference of the child should be given greater weight as the child grows older, *Williams v. Williams*, 223 Pa.Super. 29, 296 A.2d 870 (1972), it may not bear much weight, if any weight at all, because the child may be very young. *See Shoup v. Shoup*, 257 Pa.Super. 263, 390 A.2d 814 (1978) (ten-year-old child not considered mature enough to have preference carry much weight); *Commonwealth ex rel. Pruss v. Pruss*, 236 Pa.Super. 247, 344 A.2d 509 (1975) (preference of a six-year-old held not binding on the court); *Commonwealth ex rel. Doberstein v. Doberstein*, 201 Pa.Super. 102, 192 A.2d 154 (1963) (preference of a young child should not be given much weight).

Instantly, the hearing court acknowledged that Shane's preference would be to live with the Millers. (N.T. at 283a, 284a). The judge, however, decided that Shane was just too young to attach any weight to his preference. Since the hearing court is in the best position to determine such issues, *Commonwealth ex rel. Doberstein v. Doberstein, supra*, we find no error in its refusal to conduct an interview with Shane. Contrary to appellants' position, there is no rule of law which requires an interview with the child in *all* custody cases regardless of the circumstances.

■ The Millers also contend that the record is incomplete because the court did not order psychiatric evaluations of Shane, the prospective foster parents (the Youngs), and themselves.[5]  We do not agree.  In cases where there was little or no testimony concerning the effect on the child of a change in custody, psychiatric evaluations may be helpful. *See Gunter v. Gunter, supra.*  Psychological evaluations of the contesting parties may also be useful to help determine the parties' abilities to provide the child with a loving, stable homelife.  In most cases, however, in-depth testimony concerning the child and the parties, in combination with the hearing court's ability to personally observe the child, parties and witnesses, allow the court to make an informed decision as to the child's best interests.

■ In the case at bar, there was ample testimony by Annie Miller and Children's Services' caseworkers concerning Shane's background, his need for stability, and his previous reactions to being separated from the Millers.  Moreover, the prospective foster mother testified as well as the Millers' minister and neighbor.  The three days of testimony gave the court below the benefit of an in-depth, well-rounded picture of Shane and the parties and the homelife each offered.  Accordingly, we find the record to be complete without psychiatric evaluations.

■ The final allegation of error made by the Millers is that the hearing judge considered Shane's race as a determining factor in awarding custody to a black foster family.  In his opinion, the hearing court judge stated "[o]ur touchstone must be the child's best interests as defined by the courts and an extrajudicial consideration such as race has no place in our analysis."  Lower ct. op. at 43, n. 5.  *See Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976).  We therefore find appellant's contention to be without merit.

5.  Appellants' brief contained the results of psychiatric evaluations dehors the record.  This court does not condone such a practice and will not consider or be influenced by such information.

The hearing court must provide us with a complete and comprehensive opinion which contains a thorough analysis of the record and specific reasons for the court's ultimate decision. *In re White*, 270 Pa.Super. 165, 411 A.2d 231 (1979). In the instant case, the hearing court judge fully performed those responsibilities imposed upon him. His decision was made only after a full hearing which extended three days. The Millers, Shane and Children's Services were all represented by separate legal counsel.[6] Eleven witnesses appeared including Annie Miller, Mrs. Young, and two of Shane's caseworkers from Children's Services. After hearing the testimony, the court filed an extensive opinion which was both thorough and sensitive. Having made an independent and extensive review of the record, *see Sipe v. Shaffer, supra*, we agree with the lower court that Children's Services should be awarded custody of Shane.

Order of the lower court affirmed.

---

**6.** In a custody case, the child should be represented by counsel if the child's interests are distinct from the other parties'. *Stapleton v. Dauphin County Child Care Service*, 228 Pa.Super. 371, 324 A.2d 562 (1974); 42 Pa.C.S. § 6337. Shane was represented by an attorney from Central Pennsylvania Legal Services who contended that the order of the court below should be affirmed and custody should remain with Children's Services.